IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| **TRUBRIDGE, LLC,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 6:21-cv-03147-MDH |
| ) | |
| **OZARKS MEDICAL CENTER,** ) | |
| ) | |
| Defendant. ) | |

## ORDER

Before the Court is Plaintiff TruBridge LLC's ("Plaintiff's") Motion for Summary Judgment (Doc. 36). Defendant Ozarks Medical Center ("Defendant") has responded (Doc. 40) and Plaintiff has replied in turn (Doc. 43). The matter is now ripe for review and the Court has considered all briefing. For reasons herein, Plaintiff's Motion for Summary Judgment is **DENIED.**

## BACKGROUND

This is a dispute about contract language and breach. Plaintiff provides medical billing services. Defendant is a rural hospital system operating in Southern Missouri. Defendant contracted with Plaintiff for Private Pay Management services. (Doc. 40 at ¶¶ 1-4). Private Pay Management includes various specific services like mailing bills to patients, calling patients via telephone, creating a toll-free customer service telephone system, setting up the initial service, and educating hospital personnel. (Doc. 1-1 at 9). Parties executed the contract ("the Agreement") July 17, 2015 and services commenced thereafter. (Docs. 1-1 at 8, 40 at ¶ 9). Parties agree the Agreement is construed and enforced under Missouri law. (Doc. 40 at ¶ 14). The Agreement states

1

it becomes effective upon execution and lasts until no services remain in effect. (Doc. 1-1 at 3). The Agreement further states the term for the Private Pay Management services automatically renews on a certain date, unless one party gives written notice of intent to terminate at least sixty days before the date of automatic renewal. (Doc. 1-1 at 3). Disagreement in large part concerns the date of automatic renewal. Plaintiff asserts the automatic renewal occurs annually March 31, the day on which Plaintiff contends services commenced. (Docs. 37 at ¶ 22, 43 at n 3). Defendant argues automatic renewal occurs annually July 17, the day on which the parties executed the Agreement. (Doc. 40 at ¶ 27). On or about April 28, 2020, Defendant mailed Plaintiff a letter expressing intent to terminate services. (Doc. 40 at ¶¶ 26-27). In response, Plaintiff informed Defendant the contract automatically renewed March 31, 2020 and Defendant's intent to terminate was untimely. (Doc. 37-7). Plaintiff further asserted the earliest time at which Defendant could terminate the contract would be March 31, 2021, the automatic renewal date for the contract extension term beginning March 31, 2020. (Doc. 37-7).

Section Twelve of the Agreement further requires that Defendant provide Plaintiff access to data necessary to perform services for which the parties contracted. (Doc. 1-1 at 6). This same section also prohibits Defendant from intentionally impeding Defendant's access to such data and identifies damages to be paid to Plaintiff should Defendant create an intentional impediment. (Doc. 1-1 at 6). The parties agree Plaintiff did not possess data for patient accounts from January 1, 2020. (Doc. 40 at ¶¶ 22, 24). Defendant concedes Defendant's chief financial officer testified at deposition Defendant intentionally withheld patient data beginning about April 28, 2020, the date on which Plaintiff mailed its letter of intent to terminate services. (Doc. 40 at 14). The parties disagree, however, about whether Plaintiff's lack of data beginning January 1, 2020 and lasting at through at least April 28, 2020 reflects an intentional act on the part of Defendants and/or

constitutes breach. Plaintiff filed this suit against Defendant in June 2021, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. (Doc. 1).

## STANDARD OF REVIEW

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ARGUMENT

### I. Count One: Breach of Contract

Plaintiff's argument essentially advances two theories of breach. The first alleges Defendant breached the Agreement when Defendant failed to provide access to new patient data beginning January 1, 2020, as required by Section Twelve of the Agreement. (Doc. 37 at 4). Plaintiff argues this breach was intentional, occurring because Defendant signed a contract with a different

3

Case 6:21-cv-03147-MDH   Document 44   Filed 02/21/23   Page 3 of 12

company to provide medical billing services. (Doc. 37 at n. 3). Plaintiff's second theory alleges Defendant breached the contract when Defendant failed to pay Plaintiff for services between March 31, 2020 and March 31, 2021. (Doc. 37 at 16-17). Though undisputed Plaintiff gave notice on April 28, 2020 of intent to not renew the Agreement, Plaintiff argues such notice was untimely because Defendant did not provide notice sixty days before the automatic renewal date, March 31, 2020. (Doc. 37 at ¶¶ 27, 28).

In response, Defendant argues Defendant never failed to provide access to new patient data so to constitute breach. Rather, Defendant implemented a new data management system with which Plaintiff could not interface. (Doc. 40 at 27, ¶ 24). Defendant further argues Defendant attempted multiple times to solve the interface issues, but ultimately failed. (Doc. 40 at 27). This does not constitute breach, Defendant argues, because Plaintiff in fact provided access to the new patient data as contractually required. (Doc. 40 at 27, ¶ 24). Plaintiff, however, simply could not receive the data to which Defendant provided access. (Doc. 40 at 27, ¶ 24). Second, Defendant argues Plaintiff misunderstands the automatic renewal date. (Doc. 40 at 24-26). Per plain language, Defendant argues, the Agreement renews annually July 17, the date on which parties executed the Agreement. (Doc. 40 at 24-26). Because Plaintiff provided notice of intent not to renew April 28, 2020, such notice was timely and the contractual agreement ended before the July 17, 2020 automatic renewal date. (Doc. 40 at 24-26). Defendant concedes Defendant's chief financial officer testified at deposition Defendant intentionally withheld patient data beginning about April 28, 2020, the date on which Plaintiff mailed its letter of intent to terminate services. (Doc. 40 at 14).

Though neither party argues explicitly that the contract terms are ambiguous, both parties argue firmly for substantially different interpretations of the same language. In cases of contractual

interpretation, Missouri law instructs that the intent of the parties remains the most salient factor. *Bailey v. Federated Mut. Ins. Co.,* 152 S.W.3d 355, 357 (Mo. Ct. App. 2004) ("The cardinal rule for the courts in interpreting a contract…is to effectuate the parties' intent at the time of contracting.") (citations omitted). To identify parties' intent, Courts look first to the contractual language in question to determine whether any ambiguity exists. This is true even where, like the present case, parties do not explicitly argue ambiguity. *Behrick v. Konert Farms Homeowners' Ass'n*, 601 S.W.3d 567, 573 (Mo. Ct. App. 2020). If no ambiguity, courts glean an understanding of the parties' intent through the contract language as a whole, without taking into consideration other evidence. *Grand Inv. Corp. v. Connaughton, Boyd & Kenter, P.C.,* 119 S.W.3d 101, 112 (Mo. Ct. App. 2003). When contractual language lacks ambiguity, summary judgment may be appropriate. If a court, however, identifies ambiguity, a question of fact remains, precluding summary judgment. *Block v. N. Am. Sav. Bank, F.S.B.*, 59 S.W.3d 567, 573 (Mo. Ct. App. 2001) (citations omitted). Ambiguity exists in a contract where that contract is open to two different, but reasonable interpretations. *Id*. Put differently, "ambiguity occurs when there is duplicity, indistinctness or uncertainty in the meaning of the words of a contract." *Id*. (citations omitted). Ambiguity does not exist, however, where parties simply disagree about the meaning of otherwise clear contractual language. *Carondelet Health Sys., Inc. v. Royal Gardens Assocs.*, 943 S.W.2d 669, 673 (Mo. Ct. App. 1997). Ambiguity is a matter of law for the Court to decide. *Missouri Consol. Health Care Plan v. BlueCross BlueShield of Missouri*, 985 S.W.2d 903, 908 (Mo. Ct. App. 1999).

## a. Language Defining Whether Notice was Timely is Unambiguous but Record Lacks Evidence to Conclude no Dispute of Material Fact.

The first specific interpretative issue for this Court to decide is whether ambiguity exists in language that defines whether Defendant's April 28, 2020 notice of intent not to renew was timely. The language at issue is as follows.

> **Terms of Agreement**: This Agreement shall become effective upon execution by the parties and, unless sooner terminated as provided hereinafter, shall remain in effect so long as a Service remains in effect.
>
> > **Business Services and Managed IT Services**: Services identified in their EXHIBIT A as a business service ("Business Service") or a managed information technology service ("Managed IT Service") shall become effective upon the commencement of the Service and shall remain in effect for the initial service term specified in the Service's EXHIBIT A. Upon expiration of a Business Service's or a Managed IT Service's initial service term, the Service shall be automatically extended on an annual basis unless sixty (60) days prior to the expiration date of the initial service term, or any extended term, either party gives written notice of its intent to terminate the Service. (Doc. 1-1 at 3).

The Agreement's Exhibit A states the service term for the Private Pay Management business service is one year. (Doc. 1-1 at 10). Apart from the date of execution, the Agreement altogether lacks reference to any specific dates.

The plain language of the above provision is sufficiently unambiguous. Plaintiff's interpretation of the language is generally correct. The Agreement is clear that the initial service term or any extended term automatically renews both the service term itself as well as the Agreement, unless a party gives notice sixty days before one year after the initial service term or any one-year automatic extension. Plain language is sufficiently clear also that the Agreement, as separate from the initial service term for business or managed IT services, becomes effective upon execution of the Agreement. The language is sufficiently clear too that the service term, and thus the Agreement itself, may, but does not necessarily, renew annually on the date on which the

6

parties executed the Agreement. The date on which the service term renews, and the Agreement continues, depends on the commencement of services, not execution of the Agreement. Any difference between the parties' interpretations reflects simple disagreement rather than ambiguity.

The language's lack of ambiguity, however, fails to resolve all issues related to this clause. The record in this matter lacks sufficient evidence to enable this Court to determine when services actually commenced. Plaintiff claims the Agreement *automatically renewed* March 31, 2020 (Doc. 73 at 9), but also claims services *commenced* generally in "March 2016." (Doc. 37 at 7). It appears the only place in the record Plaintiff claims services *commenced* specifically on March 31, 2016 (Doc. 43 at n. 3) cites as support an affidavit of Plaintiff's director who claims private pay services began generally in "March 2016." (Doc. 37-2 at 3). Deposition evidence appears to highlight an August 3, 2020 email conversation between Defendant's employees wherein one employee tells another, "the first term to [Plaintiff] was on March 14, 2016." (Doc. 37-3 at 14). The record, however, lacks any agreement from Plaintiff that services commenced March 14, 2016. The record similarly lacks any claim by Plaintiff that the service term would renew annually on March 14. Further confusing matters, Plaintiff's counsel sent Defendant a letter claiming, "[Plaintiff] began providing [Defendant] the services required of it under the Agreement on April 1, 2016." (Doc. 37-9 at 2). True, Defendant has conceded Plaintiff "began providing [Defendant] private pay management services in March of 2016." (Doc. 40 at 7). This concession, however, lacks specificity. Without knowing the exact date on which services commenced, the record lacks evidence enabling this Court to conclude no dispute exists as to the date on which services commenced and therefore automatically renewed. Without knowledge of when services

commenced, it remains impossible to determine the timeliness of Defendant's April 28, 2020 letter.[1]

### b. Language Defining Defendant's Obligations to Plaintiff as to New Patient Data is Ambiguous and Questions of Material Fact Remain

The second interpretative issue for this Court to decide is whether ambiguity exists in language that defines Defendant's obligations to Plaintiff as to new patient data. The relevant language found in Section Twelve of the Agreement is as follows.

> **Data Access:** It is mutually understood that [Defendant] must provide [Plaintiff] with access to the data necessary to perform the Service(s) during the term of this Agreement. In the event [Defendant] intentionally creates any impediment to such access (an "Impediment"), [Defendant] agrees to pay [Plaintiff] an amount equal to the prorated Service Fees that would have accrued for an affected Service during the remainder of the Service's then current term. The prorated Service Fees shall be calculated based upon the average monthly Service Fees for the affected Service provided in the previous six months. [Plaintiff] shall provide [Defendant] with written notification upon becoming aware of an Impediment and [Defendant] shall have five (5) business days from the receipt of such written notice to cure the Impediment. In the event the Impediment is not cured within five (5) business days, the prorated Service Fees shall then become due and payable in full. (Doc. 1-1 at 6).

Plaintiff argues Defendant failed to provide access to new patient data for care sought after December 31, 2019. (Doc. 37 at ¶¶ 24, 32). Plaintiff asserts this to be part of a plan to switch billing service providers from Plaintiff to a competitor. (Doc 37 at n. 3). Defendant argues it

---

[1] This lack of clarity likely stems in part from the Agreement's lack of specificity. By plain language, "commencement of services" occurs the moment Plaintiff first begins providing Private Pay Management services to Defendant. Providing any large-scale, service-oriented product, however, often requires delivering various smaller services. This is true as well in the instant case. The Agreement, for example, defines Private Pay Management to include various narrower services like mailing bills to patients, calling patients via telephone, creating a toll-free customer service telephone system, setting up the initial service, and educating hospital personnel. (Doc. 1-1 at 9). Actions taken internally among Plaintiffs' employees, some perhaps without Defendant's knowledge, may seek to accomplish one or more of these goals. Meetings among Plaintiff's employees, for example, to create an initial set-up plan for Defendant, may reasonably indicate services have commenced for purposes of the Agreement. Further, in seeking to clarify the narrow services under the Private Pay Management umbrella, Exhibit A to the Agreement lists some of the specific activities under the Private Pay Management umbrella. In doing so, Exhibit A uses the word "includes," rather than something more definitive like "constitutes" or "consists of." The contract's lack of specificity reasonably invites some doubt about the full scope of the specific services involved in Private Pay Management and when those services commence.

implemented a new data management system January 1, 2020. (Doc. 40 at 22, ¶¶ 36, 37). Defendant further argues Defendant provided Plaintiff access to new patient data as required by the Agreement. (Doc. 40 at 27, ¶ 24). Any inability of Plaintiff to access those data, Defendant contends, lies with Plaintiff's inability to interface with Defendant's new system rather than Defendant providing access to those data. (Doc. 40 at 27, ¶ 24). Defendant argues, though it ultimately failed, Defendant attempted several times to implement various solutions to remedy Plaintiff's inability to receive Defendant's data. (Doc. 40 at 27). Defendant concedes Defendant's chief financial officer testified at deposition Defendant intentionally withheld patient data beginning about April 28, 2020, the date on which Plaintiff mailed its letter of intent to terminate services. (Doc. 40 at 14).

Because the Agreement fails to specify anything beyond a requirement that Plaintiff "must provide [Defendant] with access to the data necessary to perform the Service(s)," questions remain as to whether the parties intended "access" to mean Plaintiff actually possessing the patient data or the simple making available of the data for Plaintiff to obtain. Both interpretations of the word appear reasonable, thereby precluding summary judgment. The fact that Plaintiff was effectively able to interface with Defendant's pre-2020 data management system and thereby receive patient data, does not necessarily show parties intended at the time of contracting the word "access" to mean Plaintiff's actual possession of the data.

Apart from ambiguity surrounding the parties' intent as it relates to the meaning of "access," other questions of material fact remain, pertinent to this contract provision. For example, it remains unclear whether the specific steps taken by Defendant amount to providing access to new patient data as required by the Agreement. In other words, a question of material fact remains as to whether Plaintiff lacked data because Defendant failed to provide access or because Plaintiff failed to

9

receive the data. If Defendant in fact failed to provide access, yet another factual question remains as to whether this failure constitutes an intentional impediment as contemplated by Section Twelve of the Agreement, thereby triggering the damages calculation identified in that section.

### c. Material Facts Remain as to Whether Plaintiff Substantially Performed

Defendant's answer to Plaintiff's complaint includes reference to the possible affirmative defense of prior breach on the part of Plaintiff. (Doc. 9 at 7). Defendant's response to Plaintiff's motion further argues Plaintiff failed to timely mail billing statements, implemented a restrictive character limit on patient addresses causing patients to not receive statements, failed to send statements to patients when balances fell below a certain amount, and removed certain accounts from a collection agency. (Doc. 40 at 28). Defendant supports these allegations with a signed affidavit from one of Defendant's administrators. (Doc. 40-1). Defendant argues this shows Plaintiff failed to substantially perform under the Agreement, precluding recovery in the present matter. In response, Plaintiff argues deposition testimony from Defendant's chief financial officer indicated she believed Plaintiff's performance on the contract was satisfactory, precluding Defendant's argument Plaintiff failed to substantially perform.

While Defendant's chief financial officer may have testified at deposition that Defendant's own collection rates were satisfactory, this does not preclude Defendant from asserting Plaintiff failed to substantially perform under the contract. The extent to which Plaintiff's services bear on Defendant's overall collection rate remains unclear from the record. Further, Missouri law dictates whether a party has substantially performed under a contract is ordinarily a question of fact for jurors. *See Behrick v. Konert Farms Homeowners' Ass'n,* 601 S.W.3d 567, 575 (Mo. Ct. App. 2020) ("the rights and duties of the parties flow from the contract itself; whether the parties

10

Case 6:21-cv-03147-MDH   Document 44   Filed 02/21/23   Page 10 of 12

comported themselves within those rights and duties is necessarily a question of fact which the contract itself cannot answer.") (citations omitted). Plaintiff is correct that a trial court may occasionally find breach is immaterial as a matter of law. *Curt Ogden Equip. Co. v. Murphy Leasing Co.,* 895 S.W.2d 604, 609 (Mo. Ct. App. 1995). This, however, is allowable only in limited situations where specific facts not in dispute show a breach is *de minimis*. *Id*. In *Curt Ogden*, facts not in dispute showed the plaintiff delivered 358 out of 373 promised trailers. *Id*. The appellate court upheld the trial court's finding of a *de minimis* breach where the plaintiff failed to deliver only about four percent of the number of products promised. *Id*. While Defendant admits its own collection rate was reasonable while Plaintiff supplied billing services, this does not equip this Court with specific, agreed-upon facts showing only a *de minimis* breach, like *the Curt Ogden* plaintiff's failure to deliver only four percent of trailers.

## II.  Questions of Material Fact Remain as to Count Two's Claim of Breach of the Implied Contract of Fair Dealing

"In Missouri, all contracts have an implied covenant of good faith and fair dealing*." Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 877 (Mo. Ct. App. 2012) (citations omitted). Breach of this covenant occurs when a party "exercises a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the agreement and denies the movant the expected benefit of the agreement." *Id*. (citations omitted). Here, because ambiguous contract language and other questions of material fact precludes summary judgment on Count One's breach of contract claim, summary judgement is similarly inappropriate for Count Two.

## III.  Damages Not Limited by Language of Complaint's Paragraph Twenty-Two

In its response to Defendant's Motion for Summary Judgement, Defendant appears to argue Plaintiff is limited in its ability to recover beyond $330,791.38, an amount discussed in paragraph

11

twenty-two of Plaintiff's complaint. Defendant's argument here is not entirely clear. What is clear, however, is the amount listed in paragraph twenty-two of Plaintiff's complaint is not an admission as to the final calculation of damages. Rather, it is simply a description of the content of a letter Plaintiff sent Defendant discussing Plaintiff's belief about the amount Defendant owes Plaintiff under the damages calculation laid out in Section Twelve of the Agreement. Statements in paragraph twenty-two of Plaintiff's complaint do not limit Plaintiff's recovery to the amount discussed.

## CONCLUSION

For foregoing reasons, Plaintiff's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated: February 21, 2023
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　 /s/ Douglas Harpool
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**DOUGLAS HARPOOL**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**